Filed 1/23/14  P. v. Reyes CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047950 |
| v. | (Super. Ct. No. 09NF1710) |
| EDWARD JAMES REYES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Dan McNerney, Judge.  Affirmed.

Richard De La Sota, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

We appointed counsel to represent Edward James Reyes on appeal. Counsel filed a brief that set forth the facts of the case. Counsel did not argue against his client but advised the court no issues were found to argue on his behalf. Pursuant to *Anders v. California* (1967) 386 U.S. 738 (*Anders*), to assist the court with its independent review, counsel provided the court with information as to issues that might arguably support an appeal. Counsel provided information on the following three issues: (1) whether Reyes's convictions were supported by substantial evidence; (2) whether the accomplice testimony was sufficiently corroborated; and (3) whether Reyes was prejudiced by gang expert testimony.

Counsel advised Reyes he may personally file a supplemental brief. Reyes was given 30 days to file a supplemental brief. That time has passed, and he did not file a supplemental brief. We have reviewed the information provided by counsel and we have independently examined the record. We found no arguable issues. (*People v. Wende* (1979) 25 Cal.3d 436.) The judgment is affirmed.

PROCEDURAL HISTORY

An amended information jointly charged Reyes and Mariano Martinez with conspiracy to commit murder in violation of Penal Code[1] section 182, subdivision (a)(1) (count 1), attempted premeditated and deliberate murder in violation of sections 664, subdivision (a), and 187, subdivision (a) (count 2), and being an active participant in a criminal street gang in violation of section 186.22, subdivision (a) (count 3).[2] As to count 2, the information alleged Reyes personally discharged a firearm causing great bodily injury within the meaning of section 12022.53, subdivision (d), personally discharged a firearm within the meaning of section 12022.53, subdivision (c), and he

---

[1] All further statutory references are to the Penal Code.

[2] The amended information charged Martinez with other crimes not relevant here.

2

personally used a firearm within the meaning of section 12022.5, subdivision (a). The information also alleged Reyes committed counts 1 and 2 for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

Prior to trial, the trial court granted the prosecution's motion to sever the cases of the two defendants. After the close of evidence, the court also granted the prosecution's motion to dismiss the section 12022.5, subdivision (a), allegation as to count 2. The jury found Reyes guilty of attempted premeditated murder (count 2), and of being an active member of a criminal street gang (count 3). The jury also found it true Reyes had committed count 2 for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The jury was unable to reach a verdict on count 1, and as to the allegations made as to count 2 pursuant to section 12022.53, subdivisions (c) and (d). The court declared a mistrial as to that count and those allegations.

In exchange for the prosecution's foregoing a retrial on count 1 and on the section 12022.53, subdivisions (c) and (d) allegations as to count 2, Reyes admitted an allegation as to that count that a principal in a gang-related crime personally used a firearm during the commission of that offense within the meaning of section 12022.53, subdivisions (b) and (e)(1). On the same day, the trial court sentenced Reyes to an aggregate indeterminate sentence of 25 years to life as follows: a life term with a minimum parole eligibility date of 15 years pursuant to section 186.22, subdivision (b)(5), for count 2; and a consecutive term of 10 years for the allegation as to section 12022.53, subdivisions (b) and (e)(1), on that count. The court imposed and stayed the sentence on count 3 pursuant to section 654.

FACTS

In 2009, Chicanos Kicking Ass ("CKA") and Family of Latin Kings (FOLKS) were rival street gangs. Reyes, moniker "Menace," Martinez, moniker "Stalker," and Freddie Guerrero, moniker "Cartoon" were members of CKA.

3

On May 20, 2009, Reyes, Martinez, and Guerrero picked up Jose Linares in Martinez's car and asked him if he wanted "'to go to FOLKS.'" Linares understood that to mean they were going to "jump" a FOLKS gang member. Linares told them he was willing and that he had a gun stashed or hidden. Guerrero said he wanted to use the gun, but Reyes said he did, so Linares gave the gun, wrapped in a blue or black bandanna, to Reyes. Martinez was driving the car, Guerrero was in the front passenger seat, Reyes was in the right rear seat, and Linares was in the left rear seat.

Later, they saw Ricardo Cordova, who looked to them to be a FOLKS gang member. Linares said, "There is one." Guerrero asked Cordova, "'Where are you from?'" Cordova replied, "'I don't bang.'" Guerrero and Reyes got out of the car with "wrappings" on their faces and began running after Cordova. Guerrero yelled, "CKA." Reyes had the gun in his hand when he got out of the car. One of the people who got out of the car fired three or four shots from a revolver. No one could identify the shooter, but Linares testified that when Reyes got back in the car Reyes still had the gun in his hand. Linares also testified he and Reyes later hid the gun in a drainpipe and Reyes told him, "'I think I got him.'"

Linares was charged with attempted murder as a result of the shooting involved in this case. He testified at Reyes's trial in return for a promise that he would receive a sentence of 11 years and four months for his part in the crime.

A passerby drove Cordova to the hospital. Cordova was shot in the left occiput, where the base of the skull meets the neck, behind and below the left ear. The bullet lodged next to Cordova's left jaw. The bullet blocked the left internal jugular vein, but the artery was not damaged, so the decision was made not to operate to remove the bullet.

Sergeant Henry Fantes found a "dark rag" near the Anaheim intersection of Neighbors Avenue and Onondaga Avenue after a witness pointed it out to him. The

4

parties stipulated the rag was tested for DNA and that Reyes was excluded as a major contributor, but that Amos Lopez, whose DNA sample was obtained through the CAL-DNA data bank, was a major contributor. Lopez, moniker "Stranger," was a CKA gang member.

On June 17, 2009, Anaheim police officers, including Sergeant Michael Haggerty, stopped the car used in the May 20 shooting. Martinez was driving the car and Reyes, Lopez, and another male were passengers in the car. Inside the car, officers found a length of pipe between the front seats, a souvenir wooden bat, and a claw hammer in places where they would be accessible to be used as weapons. Officers arrested Reyes. Haggerty went to Reyes's apartment at 8252 San Helice Circle in Buena Park to tell his parents he had been arrested, and with the mother's consent, he searched Reyes's bedroom. Haggerty found letters and song lyrics that made reference to "Menace" shooting "fools" on the spot. In addition, there were written references to "Forks," which was a derogatory term for the FOLKS gang.

In September 2009 Reyes and Lopez were housed in juvenile hall. A deputy probation officer, Indalesia Bravo, placed Reyes and Lopez in the same room and set up a microphone so they could be surreptitiously taped. Bravo taped their conversation and listened from the next room. Lopez was heard to tell Reyes the police had told him that Lopez's DNA was found, "[F]or, like a rag right there by where that fool got shot." After some innocuous discussion, Reyes told Lopez, "'Cause I had took off my shirt . . . white, a white, a white shirt across my face.'" When Lopez asked Reyes about a bandana, Reyes responded, "[W]e left it in the car, fool. The, the one that we wrapped it with, right? Yeah, well we came with it 'cause Twin had it right here, he pulled out the strap and gave it to me. There was no bandana.'" Finally, Reyes told Lopez, in apparent response to a question, "Nah, I threw it over there . . . ." Lopez asked, "Twin?" and Reyes answered, "Yeah[,] he came . . . with it already like packing it." "'Strap'" is a common street term for a gun.

5

Anaheim Police Department Detective Jeff Dodd testified as a gang expert. He testified that as of May 20, 2009, Reyes was an active participant in the criminal street gang known CKA. CKA was a nontraditional criminal street gang in the sense that it had white as well as Hispanic members. CKA "claimed" two different neighborhoods. It started as a tagging crew in about 1990, and its rivals included Citron Street, FOLKS, East Anaheim, Down Familia Wicked Soldiers, Small Town, Jeffrey Street, and Fullerton Tokers Town. In May 2009, CKA had approximately 45 members. It employed as common signs or symbols the names "Chicanos Kicking Ass," or "Brown Familia Chicanos Kicking Ass." Its primary activities included vandalism and felonious assaults, including stabbings and shootings. In addition, gang members would get the money to buy guns by stealing and selling drugs. CKA members Linares and Efrain Garibay had, within the requisite time period, committed the crimes necessary to establish a "'pattern of criminal gang activity'" within the meaning of section 186.22, subdivision (e).

Dodd based his opinion Reyes was an active participant in CKA on police reports and other police documentation indicating Reyes was in the company of other CKA members on a number of occasions, that he had been stopped by the police for curfew violations in areas "claimed" by CKA, and that he had gang tattoos that were indicative of gang membership. Dodd acknowledged that on a number of the occasions when Reyes was stopped by the police while he was in the company of gang members or was in an area "claimed" by CKA, Reyes either denied being a gang member, or that there was no notation in the report on which Dodd was relying that either Reyes or the people he was with admitted to being gang members.

In response to a hypothetical question mirroring the facts, Dodd testified it was his opinion the shooting was committed for the benefit of, or in association with, a criminal street gang. Dodd opined the shooting would bolster CKA's reputation because it would demonstrate to rival gangs and the community that CKA was powerful.

6

Leticia Rodriguez testified she is Reyes's mother. Reyes was 13 or 14 years old when he acquired the gang tattoos. The word "Menace" was tattooed on Reyes's body. On June 17, 2009, she allowed police officers to enter her home and search a room Reyes shared with his brother Moyses. She had another son named Andres, who was also known as "Menace." Andres, who was 23, went to juvenile hall at the age of 15 and did not return home. The crimes Andres was convicted of committing were "probably" gang-related, and the gang was likely "F Troop."

DISCUSSION

Pursuant to *Anders*, counsel raised three possible issues. We will address each in turn.

*Sufficiency of the Evidence*

The jury convicted Reyes of attempted premeditated murder (count 2), and of being an active member of a criminal street gang (count 3). The jury also found it true Reyes committed count 2 for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). As to count 2, Reyes admitted an allegation he was a principal in a gang-related crime who personally used a firearm during the commission of that offense within the meaning of section 12022.53, subdivisions (b) and (e)(1).

When reviewing a criminal conviction for sufficient evidence, this court must examine the whole record in the light most favorable to the trial court's judgment. (*People v. Brady* (2010) 50 Cal.4th 547, 561.) Reversal for insufficient evidence is unwarranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) "A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the

7

offense.  [Citation.]"  (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1624.)  A conviction for attempted premeditated murder will not be reversed if a rational trier of fact could have found premeditation and deliberation beyond a reasonable doubt based upon the evidence presented.  (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1191.)  Premeditation requires the defendant acted as "the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed.'"  (*People v. Anderson* (1968) 70 Cal.2d 15, 27.)  Premeditation and deliberation can be established with evidence of motive, planning activity, and the manner of killing.  (*Id.* at pp. 26-27; see also *People v. Stitely* (2005) 35 Cal.4th 514, 543.)

Here, there is adequate evidence Reyes planned to go into FOLKS claimed territory to find and shoot a rival gang member.  Once he believed he had found a rival gang member, Reyes exited the car with his face wrapped and with the gun in his possession.  Reyes then followed the victim around the corner where the victim was shot.  We conclude ample evidence supports Reyes's conviction for attempted premeditated murder.

Reyes was also convicted of being an active member of a criminal street gang.  The elements of the gang participation offense in section 186.22, subdivision (a), are the following:  First, active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; second, knowledge the gang's members engage in or have engaged in a pattern of criminal gang activity; and third, the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang.  (*People v. Lamas* (2007) 42 Cal.4th 516, 523.)  A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22, subdivision (a).  (§ 186.22, subd. (i).)  Dodd's testimony along with the facts of this case provide substantial evidence to support the gang participation conviction.

The jury also found it true Reyes had committed count 2 for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). A gang enhancement finding is reviewed under the substantial evidence standard. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) To establish the truth of a gang enhancement allegation, the People must prove beyond a reasonable doubt that the offense charged was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The gang relatedness of an offense may be proved by expert testimony. (E.g., *People v. Vang* (2011) 52 Cal.4th 1038, 1044, 1049-1050, fn. 5; *Albillar, supra,* 51 Cal.4th at p. 63; *People v. Gardeley* (1996) 14 Cal.4th 605, 617.) Again, along with the facts of this case, Dodd's testimony provided substantial evidence to support the jury's true finding on the gang enhancement.

*Corroboration of Accomplice Testimony*

Section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant." The section further provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) Corroborating evidence must connect defendant with the crime to satisfy the jury the accomplice is telling the truth but the evidence need not corroborate every fact to which the accomplice testifies and may be slight and entirely circumstantial. (*People v. Whalen* (2013) 56 Cal.4th 1, 55.)

Linares was charged with attempted murder as a result of the shooting involved in this case. Thus, he was an accomplice under section 1111. Linares's testimony was corroborated in a variety of ways. Less than a month after the shooting, officers stopped the car used in the May 20 shooting. Martinez was driving the car and Reyes, Lopez, and another male were passengers in the car. In Reyes's bedroom, officers

found letters and song lyrics that made reference to "Menace" shooting "fools" on the spot and there were written references to "Forks," which was a derogatory term for the FOLKS gang. When Reyes and Lopez were housed in juvenile hall, they were surreptitiously taped. Lopez expressed concern about his DNA being found in connection with the attempted murder. Reyes then commented on the circumstances of the crime including referring to "a white shirt across my face," and indicating the bandana wrapped around the gun had been left in the car. Based on all of this evidence, we conclude Linares's testimony was sufficiently corroborated.

*Gang Evidence*

Recognizing the potential prejudicial effect of gang evidence, our Supreme Court has condemned the introduction of gang evidence that is tangentially relevant because of its highly prejudicial impact. (*People v. Jones* (2003) 30 Cal.4th 1084, 1115.) Because gang evidence creates a risk the jury will infer the defendant has a criminal disposition and is therefore guilty of the charged offense, "trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) Gang evidence is subject to the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 (*Avitia*).) If "evidence of gang activity or membership is important to the motive, it can be introduced even if prejudicial. [Citations.]" (*People v. Martin* (1994) 23 Cal.App.4th 76, 81.) "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' [Citations.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

Gang evidence, including expert testimony, is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements. (*Avitia, supra,* 127 Cal.App.4th at p. 192.) A properly qualified gang expert may testify about a wide

10

range of issues, including a gang's territory, retaliation, graffiti, hand signals, tattoos, and clothing. (*People v. Lindberg* (2008) 45 Cal.4th 1, 46-47.)

Reyes was charged with conspiracy to commit murder and attempted premeditated and deliberate murder. It was alleged these two crimes were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1). Additionally, Reyes was charged with being an active participant in a criminal street gang in violation of section 186.22, subdivision (a). Gang evidence was also relevant and probative on the issue of motive. Accordingly, we conclude Reyes was not prejudiced by the amount and the nature of the gang testimony.

In addition to reviewing the issues suggested by counsel, we have reviewed the entire record. Having done so, we conclude there is no arguable issue on appeal.

## DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


FYBEL, J.


11